Clerk, call the next case, please. 3-15-05-72, Richard A. Renchen, Appellate Cross Appellant by Ernest Gowen, v. Thomas Renchen, Appellant Cross Appellate by Tony Brazel. Okay, Mr. Brazel. Good afternoon. Good afternoon. May it please the Court, Mr. Gowen. First off, it's a poor accent. But it gets mispronounced a lot. As I mentioned, I'm Tony Brazel. I represent Thomas Renchen. I knew I should have changed that spelling. If I had a Z in it, which my grandfather changed, then maybe everybody would say it right. Which is funny, because I heard her asking about the name of one of the other defendants. But, Judge, at issue in this case, there's two issues that I wish to address this afternoon. Number one is whether there was a breach of fiduciary duty by my client, Thomas Renchen. And second, if you should find that there was a breach of fiduciary duty by Tom, whether he was entitled or should have been ordered to pay back the $500 a month trustee fee that he had received over the life of the trust. And just a brief background, this case involves, obviously, the Renchen family. It's a Vera Renchen trust. Vera Renchen was the mother of four children. Two of those children are the parties to this case, Thomas and Richard. There was also an individual by the name of Robert who was alive at the time the trust was made, but deceased before Vera Renchen was deceased. And there was another brother, William. William is kind of not at issue in this case. William was actually written out of the trust. And Robert, as mentioned, died. The trust was a trust that was created in the mid-1990s, I think 1994, by Vera Renchen. She set herself up as the trustee. That lasted until, I believe, 1998. At that time, she asked Thomas to be the trustee. From that time on until the current date, Thomas has performed his duties as trustee of the Vera Renchen trust. And, as I mentioned, had paid himself the sum of $500 per month. The breach of fiduciary duty that was found by the trial court involved a loan that Thomas made to himself and his wife, even though the tax return shows it was to Tom and Joyce. Tom said it was mainly to him and did not deny it. That was made in August of 2008. That was a $125,000 loan. The court found that even though the trust document, which it does if you look at paragraph J in section 5, allows for a trustee to make a loan to himself, specifically allows that, I don't know if Mr. Gowan agrees with that, but the court found that in the memorandum decision, which was implemented or incorporated into the order. So rather than looking, there's cases and they've all been cited. The cases, in our opinion, stand for the fact that just because you loan money to yourself, if the trust document allows that, that it is not a breach of fiduciary duty. You have to consider certain elements. And we believe that those elements, number one, were not considered by the trial court. If they were, that wasn't spelled out. And I think the trial court, in the motion to reconsider, I think the trial court stated that she didn't consider the loan, the $125,000. And I think that it's our opinion that the trial court made a judgment in error and it was against the manifest way to the evidence. The evidence showed that actually after the loan was made and the state tax return was filed, the loan was made in August. Vera died later that same year of 2008. And there was a tax return, a state tax return, that was due in September and was filed in September of the following year. And in that state tax return, Tom, who signed the tax return and had prepared it with the assistance of an attorney and not me, Robert Lebeau and an accountant, had very specifically stated in Schedule C, the promissory note from Thomas and Joyce Wrenchin with interest at 5%, accrued interest from August 21, 2008. It lists $125,000 of loan and it lists the accrued interest as $1,968. And, in fact, after one year of the note and before anything was filed, before there was any request for an accounting by Richard Wrenchin, the plaintiff in this case, Tom had actually, Mr. Wrenchin, Thomas Wrenchin, had paid back to the trust interest of $6,250. The court appeared to ignore both that evidence and the evidence that was listed in the schedule. And it's our position, and I think it's the position that only makes any sense, I mean, what was this if it wasn't a loan? Okay, it doesn't have that it's due in five years. It doesn't have a date of termination. But what else is it? If it's not a loan that Tom, and he testified, and there's no dispute to that, and, in fact, there's corroborating evidence because he did pay interest. But Thomas testified that he intended to pay this back, and he admitted that he didn't have any set time, and he did pay it back, albeit shortly after this lawsuit was filed. It was paid in full with interest, which is shown on exhibit number five of the plaintiff's case. It has the accounting that Thomas prepared after the case was filed. Did he report to anyone that he had made a loan to himself? He reported to the federal government. Did he report to anybody related to the trust? He did not. At that time, the trust requires, and there is some dispute about this, who had to be notified of any accounting prior to Vera Rinchin's debt. The trust required that he notify the income beneficiary yearly of an account. That income beneficiary, up until her death, was Vera Rinchin. Now, we can make an argument, and I don't know whether it's relevant to whether the other brothers that were alive at that time would have been William and Richard, whether they had an interest in getting an annual report. But, no, he did not report that he had loaned any money to himself, except he did to the federal government. In fact, this is a case, and I know you've read it, it's four brothers that really didn't get along. It was kind of two and two, William and Thomas and Richard and Robert, and this had lasted, in fact, I think the testimony, I just read that this morning, I think it was since either 1999 or 2000, I want to say 2000, I think Richard said he hadn't talked to Thomas since the year 2000. So this was, for lack of a better word, a dysfunctional family that didn't get along, had personal issues between themselves. I'm not saying that that excuses the requirement, but the other factor to consider is not once during this whole period of time until 2011, and I believe that was in October 2011, did Richard, the plaintiff in this case, Richard Rinchin, ever ask for an accounting. Now, again, I'm not suggesting that takes away Tom's requirement to do it, but it was never asked for, and I think that's something that should be considered by the court. Did he ever make an accounting to Vera? No. Vera, no, he testified he did not. Vera, for the last, shortly after she was in ill health and suffered from what he believed to be Alzheimer's and would not have understood anything, I think it was from the early 2000s that she was not able to understand what was going on, understand numbers, et cetera. Did she have a guardian? She did have a guardian. It was Thomas. Thomas was appointed the guardian, and I believe that was in the late 1990s when he also was appointed to be the successor trustee of the Vera Rinchin Trust. But you have to look, and Thomas testified to this, that he thought he had the ability to make the loan. In fact, the courts suggest and seem to agree with us that there was the ability to make that loan in the actual trust document. The trust didn't lose any money. In fact, the trust gained money because Thomas paid it back at 5%, and that was much higher than the interest rates. In fact, I think he testified that at the time alone, the money markets would have been making about a percent or so. So he actually made money. There was no loss or no ill intent. There wasn't any intention to hide this. I mean, he reported it on the federal tax return, and he paid interest on it. So I think the decision of the court was against the manifest way, and I don't believe, and I ask you with fine, that there was no breach of fiduciary duty on behalf of Thomas. When you say it wasn't hidden because it was a federal tax return, that only went to the federal government, right? Who else got the copy of the tax return? Well, other than the attorney who was also an attorney for the plaintiff at that time, or at one time was. But they could get access to it, and they could ask for it, and nobody ever asked for that tax return. I mean, it wasn't voluntarily sent to a family member, but as you say, nobody asked for it. And I agree with that. It was not voluntarily sent, but again, and I think it's important that it was never asked for. Not that they have a burden to do that, but obviously in October there was a meeting before I was involved in this case with Mr. Lebowitz, testified to at a trial where Richard Renshin, even though he was a little, went back and forth on that. I think if you read the transcript you'll see that, and I can't remember if it was morning or afternoon, my best, I think it was, that I was asking questions, and he was really unsure because he couldn't tell us. He said he knew nothing about certain things that happened. One of them was the $125,000 loan, but it was in his complaint, and I was asking how he knew to put that in the complaint if he didn't know about it or never received any accounting. Well, when he comes back after lunch or when Mr. Gowan was asking questions, oh, yeah, he remembered that, that they had had some documentation they received. In fact, one of the documents he testified he received was the tax return. In fact, and he said something about there was the $5,000 that was mistakenly given to William at one point in time. He said that was in there, but I showed him the tax return and he couldn't get it. So he obviously had other information, and he admitted he did receive some other information at that meeting prior to the filing of the lawsuit, albeit he was kind of sketchy about what information he received. No one got any information about the loans to Sunny Acres either? To Sunny Acres, no. There was no loan. They would have had that. That was received in October of 2011. And the second issue is if you do find that there was a breach of fiduciary duty, and by the way, the trial court didn't find that any loans to Sunny Acres was a breach of fiduciary duty. I mean, there's no doubt that the trustee of the trust had the ability to invest money, had the ability to loan money, and I think that was acknowledged by the court. So those loans, I think they were definitely approved by the trust, and they were repaid, and they were repaid with interest at an interest rate that was greater than what the standard interest rate you would have received for a CD. I think that Mr. Wrench and Tom testified that it was a certain percent above prime rate. So those were fully repaid, and there was never any loss that occurred to the trust. The other issue, the second issue, is if you do find that there was a breach, and you agree with the trial court that there was a breach, whether Thomas was entitled to the $500 a month that he received as compensation as trustee. Tom originally didn't receive anything. He had a conversation. This is all testified to. He had a conversation with the attorney for the trust and also Sonny Akers, Robert Lebeau, and it was suggested that he could take $500 a month, which Tom did, and he paid himself $500 a month throughout from 1998 until probably when this case, approximately when this case was filed, but shortly thereafter. And the judge, in her opinion, felt that, at least the way I read that opinion, I think since there was a breach of fiduciary duty that then he had to pay that money back. And I disagree that that's what the law states. I think there are several factors that you need to look into. I mentioned some of those. They're all kind of the same factors. You've got to look at the intent of the person, whether there was any loss to the trust, whether there was anything that they violated, other trust provisions. There are several factors, and those are set forth in the Jones case that I put in my brief. And when you look at those, I mean, there's no doubt that, number one, Tom did perform work for the trust. He outlined in great detail of all the work that he had done for the trust. Did he keep records? No. Was he able to testify to certain things he did? Sure. Did the judge find that that was not worth $500 a month? No, she didn't say that. The trial court didn't say that. But then the trial court did order him to pay back from day one, and the only violation or breach of fiduciary duty would have occurred. And plus, throughout this whole period of time, the trust was making money. There's not an allegation that the trust lost any money. There's no testimony. And I know in the case that the judge cited, and I'm going to butcher the name of that case, Muvah Arafu, that case there was money that was lost, there was funds that were dealt with in cash, there was all kinds of issues, totally inconsistent with what happened in our case. We had 1,700 checks, which is what Tom testified to, that actually were placed in evidence at the trial that Thomas had wrote. Did a significant amount of work. Made money for the trust. And aside from the one loan of the money to himself, which, again, we don't believe is a violation of trust, there was never any indication of any other improprieties. And I guess my feeling was that, and our feeling is, that the $500 per month should have been approved. He shouldn't be asked to pay that back. And if you were, if you wanted to say that that was a breach that occurred in August of 2008, is that you go back to that date and you repay the $500 a month from then, because other than that there's, and I don't think that's appropriate, that was something I suggested that's in the record. Sometimes I wish I wouldn't have put that in there, I just thought that made sense at the time. But I don't believe that he committed any breach. But that seems, if you're going to start that was a breach, start right then. What was the $500, what kind of factors did they use to determine that amount? Well, it's what you do for the trust. I mean, he wrote, he took care of her home. He had to sell her home that she had in Florida. The trust had the assets, he had to invest them. I know he did things, how much time was involved? How much time? I think he testified that it was 10 to 15 hours a week. Sort of averaged it out. I think that's what he did. Yeah, I'm sure there's times where he had, like when she died, he had a lot of, I mean he didn't go into that honestly in the record, it's not there, but I mean he said he had to go talk to accountants, he had to talk to lawyers, he had to file, do all the paperwork to file the estate tax return. So sure, there was a lot more time there. Probably when she first went into a nursing home, there was always a lot of time in taking care of the financial situations there. Her bills probably increased at that time, even though I think all along, he paid her bills, he paid the bills for the house, he paid the bills for the nursing home. Sort of a generalized thing, this is what we had to do, generalized things, so this is why. Correct, yeah, I think he was pretty specific in what he did, but yeah, the general trust work. I mean, he didn't write, keep a log and say that I spent two hours Monday, October 12th, doing bills for Vera. No, he didn't do that. What's the authorization in the trust agreement for him to get the money? For the $500? For the $500? Well, and that's confusing too, because it does, in the one section, it says that the corporate trustee is entitled to money, and it doesn't specifically delineate whether you can pay yourself any money, but then my statute says that the trustee is entitled to reasonable compensation. So I don't think that was really an issue in this case. The issue was whether he had a breach of fiduciary duty, according to the trial court. But the trust agreement itself limits what he can recover to expenses, doesn't it? The trust agreement does talk about expenses, and then it has a corporate trustee, but it doesn't say that the trustee can't receive any money, and the statute in Illinois, I think, would rule on that, that you're entitled to a reasonable compensation. Unless it's limited by the trust agreement. Yeah, I don't think it limits, but it doesn't say that you can charge a reasonable. I would agree. You have to listen to Tom's or reread Tom's testimony. I mean, he believed he was entitled to that. Robert Leveau is attorney, and he can't rely on Mr. Leveau, who was the attorney all through this period of time for the trust, and he suggested the $500. That's where that came from. Thank you. Thank you. Mr. Gowan, good afternoon. Good afternoon. Please, the court. Mr. Brazen. I have to start with a bookkeeping entry, and it's not a most favorable note. The opening line in my reply brief indicates a statement that Thomas does not deny the obligation that he owed if I do share your duty, which is 100% wrong. Paragraph or allegation 34 of our complaint alleged that he owed such a duty. The corresponding allegation denies that he owed such a duty. But in any event, the court found that he owed such a duty, and he did, in fact, breach it. My response will be somewhat fractured because I know we have a case that's kind of chock-full with a lot of issues, so I'm going to kind of hit and miss and move on if I can. Number one, Attorney Robert Leveau did not, in fact, testify at our trial concerning anything. I don't know if that's any significance, but he did not. As to his recommendation that Tom should receive $500, I asked Thomas at trial if he kept any time records over the years. He did not. Any list of duties that he performed, he did not. And as we know, over a 13-year period, he never provided an accounting. So obviously, we were faced with a traditional problem in any accounting action. Through discovery, we had to get 13 years of alleged records or whatever was available and try to piece together what happened over that period of time, because never did these individuals receive any type of accounting at all. The only communication was in 2009, yes, following Mrs. Ranch's death, when Thomas wrote to his brothers and said, I'm exercising an option to purchase Mom's shares valued at $1,156,000 for book value, which was determined to be slightly less than $71,000. He was entitled to do so. Mother was closer to Tom than any of the other brothers. We acknowledge that. But that's the only communication they received. In terms of them never, or Richard or his late brother Robert, who I also represented at one time, never asking for an accounting, there was no communication whatsoever between these people. We instituted litigation in the year it was, 1998, on behalf of Robert and Richard against Thomas and, in fact, unfortunately at that time, his mother, concerning the operation of a mobile home park. So subsequent to 1969, at termination of that litigation, there was absolutely no communication whatsoever. Richard, in fact, testified at trial. He was asked why he did not bother contacting Tom for any of this information. He said, it's a waste of time. We never got a response. We meaning he and Bob. You know, and the argument your opponent makes under that lupa. Yes. Baruco, I don't know if I'm pronouncing it correctly or not. I can't. Lupa, baruco, lupa. In that case, they say that that's very different, and there are some startling facts that are very different from that case. In this case, there's no doubt about that. Yes, sir. I mean, it seems that that case was far more, in some ways, egregious. But that was a case the trial court relied on in making certain assessments, correct? Yes, sir. Referring to that case, as I have my brief interest in the court in lupa rufo, went on to hold that the personal loans being considered in that case do not seem to be consistent with the beneficiary's interest or taken with undivided loyalty to the trust. So the court found that those loans were improper. But once again, there was a request for accountings in that case. There wasn't here. But again, if there's no line of communication, why continue wasting your breath? And I think that that's the point here. And that is a point I make in my brief. Because of the strained relationship between these three brothers, it was more incumbent than ever that Thomas Wrenchen provided his brothers with this information as opposed to avoiding it. I mean, it was arrogance to the nth degree, to be quite honest with you. So then we compiled the records. Again, I am jumping around a little bit, and please bear with me. Opposing counsel made the comment that at this October 2011 meeting that Richard was provided with an accounting, that, in fact, is Exhibit B, the VBR trust accounting, which is really a check ledger. And I maintain it was not provided at that meeting. It was not provided until the discovery process. And what would bear that out is this document sets forth the final repayment of the $125,000, quote, loan, unquote, and the $5,000 payment that was improperly made to William, and that was January 11th. So that obviously postdates the meeting of October 11th and certainly the filing of our complaint in this proceeding, November 11th. So we had nothing prior to this to do with litigation. So in the discovery process, we received checks, and we attempted to piece back together what happened. With respect to the duties performed by Thomas on behalf of the trust, he testified to a number of things he did prior to his mother's death. I asked him what he was doing to justify his $500 a month fee afterwards. He said, well, I'm protecting the interest of the trust. And that involves challenging the claim of Robert Todd Wrenchin relative to the estate of Robert Wrenchin. That's case 70AD123, which is still out there. I think the court, Your Honor, in response to your question, properly ruled that Thomas breaches fiduciary duty, and based on the cited cases, I won't bother repeating. That is a justification or a basis to deny compensation, irrespective of whether or not the trust authorized it or the statute or both. Let's go to the loan. There have been great pains here to characterize that $125,000 payment as a loan. That's not determined. I think what the court said, Judge Albrecht, in her amended order, was she addressed the proprietary nature of the loan. I think it was a great choice of words. Was it proper? And then she went into the various factors and said it wasn't a loan. Well, okay, then we hung up on what's a loan or what isn't a loan. Was it proper? It was totally improper. The reason this estate didn't close, and now I'm getting into my cross-appeal, if you'll bear with me. The reason that this estate was not closed on a timely basis, and that would have been at the latest date, September of 2009, when the estate tax return was filed, was twofold. Thomas was expending trust funds to personally challenge the claim of his nephew, Robert Todd Wrenchon, to be heir to the late Robert Wrenchon, who presumably was his uncle, but who may very well have been his father. Thomas testified that he was protecting the trust interest. He also testified that he was between a rock and a hard place because Richard was supporting Todd's claim. And he said, if, in fact, Richard changed his mind, I would be open for criticism. Not true. If all the loans and advances had been repaid by September of 2009, he could have terminated that trust on a timely basis, distributed it out, and then everyone could do whatever they pleased with respect to the probated estate of Robert. William, the disenfranchised brother, has filed a challenge. Thomas has. Richard, my client, actually supports his nephew's claim. He doesn't want any part of it. But he is funding $0.33 of every dollar of attorney's fees that have been expended with respect to this trust. So my client should have had a distribution of all available funds, no later than September of 2009, and here we are. He still received no distribution. He's pushing 70 years of age. He was the oldest of the boys, and he's received nothing. He never approved the challenge that Tom instituted. And as I also say in my brief, Tom said he was protecting the trust interest. He wasn't. The trust could not possibly have been an error. Errors are limited in Section 2.1 of the Probate Act to individuals. I asked on two separate occasions what would everyone have received under these various scenarios, and they were all over the place. At one point, I think it was a third. Then it was mother would get 50%, and each of us would get a sixth. And finally, I showed him the section of the act and said, have you ever seen this statute before? No. Does reading that statute change your mind? Yes. If Todd's claim were rejected, mother would receive 40%, and each of Richard, Thomas, and William would receive 20. After all those years, we finally had to get to trial for him to understand the Probate Act and who would get what. The trust should not have even been in existence at that point. The argument you'll hear is that mother's will, which is a typical pour-over will. I know you've seen them over the years. She sets up a very simplistic Farkas versus Williams trust. Then, in fact, if there are any assets that are not in the trust at the time of her death, pour into the trust. Very good. It's a common estate planning tool. I love it. I use it constantly. But I asked Tom, I said, at the time of her mother's death, did she own any assets that were not included in that trust? And he said no. And he was absolutely right. Any claims she may have had, or the estate of Mrs. Wrench, in and to any assets of Robert's estate were a mere expectancy and nothing else. So I dare say, jumping ahead, if, in fact, Todd's claim is rejected, then someone can open a probate estate for Mrs. Wrench and deal with that 40% at that time. But it has nothing whatsoever to do with the trust. They are two totally different animals, and you don't have the same parties. William would be Mrs. Wrench's heir. William is not a beneficiary under the trust, so you don't even have the same parties. William filed an appearance here, but my client was funding this challenge in the probate court. He wasn't even made aware of it and never, ever advised of it and never approved any of these expenditures. Then I go on, and I haven't heard a warning yet, so I'm going to keep rolling, I guess. Let me ask you a quick question in between. What do you say is the standard of review for us? The standard review? In this case. Well... Ponderance of the evidence. At the highest level. I'll be quite honest with you. You caught me. I hadn't quite, but I would say at the highest level, if that high. But I think, Justice Carter, what I want to go on to say is this. You have, in my cross-appeal, what we claim is, yes, the payment of that $125,000 was wrongdoing. The court was right on it. What I go on to say in the cross-appeal is the court could have found many, many other instances, and there's a whole litany. We paid all kinds of monies to the United Church of Christ on an ongoing basis, and here's a lady who had Alzheimer's, and I don't even think we covered whether or not she even attended. We had the ongoing payments to challenge the claim of Robert Todd Wrenchin. That money's being spent. We had loans, unsecured loans, made to Sunny Acres Enterprises, of which Thomas testified there were four. No, in fact, there were five. He thought one loan was 13... He said one loan was 13, three was actually three even. He forgot one that was $2,000. He didn't even repay that. So consequently, as of the time of trial, he hadn't even recouped another $1,700 in loans that he made without anybody else's knowledge to this corporation. Two minutes, thank you. The other issues being that when Thomas paid a $10,000 fee to the accountant who made the determination of book value, which I thought was arrogance that it's utmost, you'd have a highly discounted asset that your mother left you for $1,156 to $71,000, and then you pay from the trust a $10,000 fee for that benefit, which obviously did not benefit the trust. It benefited him, and that's okay, but I dare say he should have paid the fee himself. Mr. Gowen, have you given up your request for an accounting? No, hadn't quite gotten there either. We... well, yes. We settled, Your Honor, on what we had. We didn't feel that we could go any further. We had this ledger. It was testified to. It covered 13 years, and I just didn't want to go any further because all we were given was copies of canceled checks. That's it. We asked for all accountings, all records, and we got copies of checks. So we ran with it. Now, do I think there was damage because there were no accountings? Yes, I do. What were the damages? My client didn't receive his money at the latest as of September 2009, and he still hasn't received it, and I dare say any monies expended after that date should be accounted for, whether they be attorney's fees, contributions to churches, whatever. Every dime should be paid back, including all the prior expenses, fees, and the attorney's fees paid and trustee's fees. But yes, to answer your question, we really just pressed on with what we had because we want to get it done. Thank you. Thank you. Mr. Brazel? Well, first off, I think Mr. Gowen, and quite frankly, it's a manifest way of the evidence. I'll take a preponderance, but I don't think that's right. But if you want to give me that, I guess I'll take a gift, but I want to be fair. That's not right. Mr. Gowen went over the poor over will, and whether Tom was mistaken about whether there was a 50% share of Robert's estate or a 40% share. It doesn't matter. There's at least a 40% share that's going to go to Vera Renschen. Vera Renschen died after Robert died. That money is going to go to Vera Renschen unless it goes to Tom. Now, there was a case, it's 07-P-123, by the way, in Kanky County, and I can't... We actually were up here on that before on a motion for summary judgment. But the problem is, what... And I asked Richard this, and Mr. Gowen just makes that point. This money should have been distributed after the estate tax return was approved. The problem with that is, how much was he going to get? At that time, Richard Renschen had filed an affidavit supporting Robert Todd, saying that he believed that Robert Todd Renschen was the son of Robert Renschen. So he supported that. In fact, there was... You can look at the case, and I know, Justice McDade, you should be aware of that because you were on that panel. But that was a case where Richard went to the funeral home with Todd, Robert Todd, and they took samples, and those were sent off to a lab, and that's still in dispute at the trial court level, and that was a mistake the trial court in this case made because the trial court believed that the appellate court had disposed of that issue. It had not. It just sent it back and said it wasn't an adoption issue and it was an estate issue that he could take from two heirs, basically. Robert Todd could from his adopted father, William Renschen, and from his... who they claimed to be the real father, Robert Renschen. With regard to standard review, you call it abuse of discretion in your reply brief. Yeah, manifest abuse of discretion. But you mentioned manifest weight. No, manifest abuse, okay. I guess it's the same thing to me. Maybe it's not. Maybe I'm misunderstanding it. There are two different concepts, but as you said, manifest weight, in your brief you talk about abuse of discretion. And I... I'll stick with what's in my brief. I don't think it's a proof of honor. But the trouble is, and I asked Richard this, how much do you pay... how much would Tom pay you after Vera died and after the estate was returned? He didn't have an answer for that because if Robert Todd... and the reason is, if Robert Todd's found to be the heir, then Robert Todd steps into Robert's shoes and he gets a third. So do we pay... does Tom pay him a third of... 300,000? Does he pay him half, which Richard would get? And this is why Tom was between a rock and a hard place, is because if he paid, no matter what he did, he's going to be here in court. Because if he paid him the 100 instead of the 150, Richard would be complaining about that. If he paid him the 150 and then it ended up that we owe... the trust owed Robert Todd $100,000, then we'd have to try to collect that $50,000 back. So it's not as simple as that. And there is also, in that case... and it gets a lot more... but it's all testified to in this case, actually, about that there was a will, that there wasn't a signed will, there was a copy of a will, and we're litigating that right now. So who knows which way it's going to go. And that's why the court found what the trial court did, is that, yes, we're entitled to defend the interest of the trust in that case, and that's why it was appropriate to take the money out. Okay, thank you. But...and Mr. Gowan mentioned something about wasting your breath, talking to Thomas. And that's not true, because... and, you know, a simple letter would have got a response. There was never one letter written by Richard. The only time they finally... when he gets Mr. Gowan, they set up a meeting, and that's the October meeting, and Mr. Gowan is a little wrong about that, whether he mentions that they didn't get any accounting, because, I mean, look at the record. In fact, it's under Mr. Gowan's questioning. I went into a lot more detail, but he asked him, did you get the information to file this complaint from that October meeting, and he said yes. It's in the record. So, I mean, it wasn't like he was going to be wasting his breath talking to Tom. Sure, they didn't talk, but if he would have requested accounting at any time. And again, I'm not saying that Thomas shouldn't have accounted. He shouldn't. That's what the trust said. At least he definitely should have reported to Richard after Vera's death. He didn't do that. But the court found there's no damage, and there isn't any damage. He wants to argue whether the damage is whether he got his money now or then. And really, there was no evidence presented concerning any loss of the property. There was no evidence concerning what his damage is at that time. And if you review the record, you'll see that. So we would ask that you reverse the decision and find that there was, number one, no breach of fiduciary duty, or if there was, that he would still not have to repay the $85,000. Thank you. Thank you. We thank both of you for your argument. Oh, I'm sorry. One more. I'm sorry. I know it's a little unusual, but my last word is thank you. Briefly, with respect to how much to pay Todd, it's very simple. If you distribute the trust, you pay one-third to somebody. I don't care. There's a probate estate, escrow it. Give my client his third. Tom can have his third at that point and do whatever he wants with it and escrow the third with the probate court. That's very simple. But you don't continue spending my client's money for administration expenses in a claim that he doesn't even support. With respect to the communications, Mr. Browser said, well, perhaps Richard could have written a letter here or he could have done this or he could have done that. Richard and Robert were fired by their brother in 1998. So, I mean, in terms of which he may or may not have known, I know I was there. So there was no communication here. He testified. I said, well, how was the relationship with Richard and Robert? Adversarial. How was your relationship with your brother, William? How's the relationship with the brother should be? Great. It was an honest answer. It's as clear as can be. But again, it reinforces the argument that he should have done it better than most. Secondly, with respect to the accountings, he should have been providing accountings prior to his mother's death and the Whelan v. Whelan case, which this district handed down, I said if you have income beneficiaries in existence at the time and it's determined who they are, yes, we did, all three of the boys, then you provide them their income beneficiaries and they get accountings. So no accountings were ever done, ever, and they should have even been done before Mrs. Renshaw passed away. As terms of whether or not Richard was confused, whether or not he got that BBR check accounting, as I explained, the entries post-dated that meeting. We got them later, but again, I don't see of any real significance. That's all we got, a check ledger, and not the typical accountings that you'd learn to expect in cases such as this. This should have been done clearly and neatly and nothing was done. And my client has suffered, and he still continues to suffer as we sit here today. Thanks for your time. Thank you. We thank both of you for your arguments this afternoon. We'll take the matter under advisement and we'll issue a written decision as quickly as possible. The court will stand in brief recess for a panel change. Thank you. Thank you. Thank you. Thank you.